EMGE & ASSOCIATES
DEREK J. EMGE, SBN: 161105
525 B Street, Suite 760
San Diego, CA 92101
Telephone: (619) 595-1400
Facsimile: (619) 595-1480

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY
WAYNE T. LAMPREY, SBN 95408
505 Sansome St. Suite 900
San Francisco, CA 94111
Telephone: (415) 392-7900
Facsimile: (415) 398-4321

Attorneys for Relator

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA '11 CV2975 WQH JMA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [UNDER SEAL], <br><br> Plaintiffs, <br><br> v. <br><br> [UNDER SEAL] <br> Defendants | CASE NO. <br><br> **COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT** <br><br> [FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)] |

COMPLAINT

EMGE & ASSOCIATES
DEREK J. EMGE, SBN: 161105
525 B Street, Suite 760
San Diego, CA 92101
Telephone: (619) 595-1400
Facsimile: (619) 595-1480

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY
WAYNE T. LAMPREY, SBN 95408
505 Sansome St. Suite 900
San Francisco, CA 94111
Telephone: (415) 392-7900
Facsimile: (415) 398-4321

Attorneys for Relator

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Darryn KELLY,<br><br>Plaintiffs,<br><br>v.<br><br>SERCO INC, a New Jersey Corporation, and DOES 1-5,<br>Defendants | CASE NO. 2975 WQH JMA<br><br>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**<br><br>[FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)] |

1

COMPLAINT

Plaintiff, Darryn Kelly, in his capacity as a Relator ("Relator"), files this Complaint against Defendants and alleges as follows:

## I.
## INTRODUCTION

1. This action is brought on behalf of the United States to recover damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. sections 3729, et seq. (hereinafter "the Act").

2. Defendant Serco, Inc. ("Serco") submitted false and fraudulent claims for payment to agencies of the United States, including but not limited to the Department of Homeland Security ("DHS") and the United States Customs and Border Protection ("CBP"), in connection with project management services Serco contracted to provide for the Advanced Wireless System (AWS) Spectrum Relocation Project ("AWS Project"), and created false and fraudulent records in support of its claims. Defendant failed to put in place a sound Earned Value Management System (EVMS") as part of its project management services as required by its contract, including failing to create charge accounts and methods of tracking work and costs associated with the AWS Project, and because such system of coding charges did not exist, Serco created false and fraudulent data and reports. As a result of Defendant's fraudulent conduct and misrepresentations and knowing submissions of false claims, the United States has overpaid for services that were rendered and has paid for services that have never been rendered.

3. Relator brings this action on behalf of the United States pursuant to the "qui tam" provisions of the Act. Those provisions allow and empower individuals with knowledge of violations of the Act to file suit on behalf of the government, and, to encourage individuals to do so, provide that these individuals are to share in any resulting recovery.

4. Relator estimates that the government has sustained damages as a result of the violations alleged below that are well in excess of $10 million before trebling pursuant to the Act, and excluding penalties.

## II.
## PARTIES

5.  Relator Darryn Kelly is an individual and a resident of San Diego County, California. He was employed by defendant Serco, Inc. ("Serco" or Defendant) as an Earned Value Management Data Analyst at its facilities in San Diego, California. His position as an analyst required him to identify and investigate deviations from the EVMS with respect to project management for the AWS Project.

6.  Defendant Serco, Inc. is a corporation organized and operating under the laws of the State of New Jersey with its principal West Coast place of business in San Diego, California.

7.  Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1-5, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege the true names and capacities of these defendants when ascertained. Plaintiff is informed and believes that each of the fictitiously named defendants is legally liable as alleged herein.

8.  "Defendant" and "Serco," as used herein, refers to defendants Serco Inc. and Does 1-5, collectively.

9.  At all times mentioned herein, unless otherwise stated, each defendant was the agent of each of its co-defendants, and in doing the things herein mentioned, was acting within the scope of its authority as such an agent, and with the permission and consent of its co-defendants.

## III.
## JURISDICTION AND VENUE

10. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 31 U.S.C. § 3732 (federal court jurisdiction for actions brought pursuant to 31 U.S.C. § 3730).

11. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), because Defendant can be found in this district and transacts business in this District as alleged in this complaint, and under 28 U.S.C. 1391(b) and 1395(a).

# IV.
## ALLEGATIONS COMMON TO ALL CLAIMS

**A.**  **The AWS Relocation Project, Serco's Role, Project Mangement and Earned Value Management System (EVMS)**

12. Plaintiff United States of America, by and through its agencies including but not limited to the DHS and, more specifically, the CBP, has entered into contracts to have Defendant provide project management for the retrofitting and upgrading of communications towers along the United States' border with Mexico, a project known as the Advanced Wireless Services ("AWS") Spectrum Relocation Project ("AWS Project").

13. The AWS Project was intended to create a "virtual border" between the United States and Mexico by installing sophisticated electronic equipment along the border on existing towers and facilities. The Project was part of the "Virtual Border Mission" and overseen by the CBP,

14. The contract for the current phase of the AWS Project was awarded in the amount of approximately $52 million

15. Serco was hired in connection with the AWS Project to provide critical project management functions to help ensure that the Project proceeded as planned and on budget -- and to identify immediately when variances and problems occurred...

16. As part of its project management duties, and as required by its contract, Serco was required to develop and put in place a management tool referred to as an Earned Value Management System ("EVMS"). The United States requires EVMS to help the government monitor projects and avoid unnecessary schedule delays and cost overruns.

17. The parameters and requirements of EVMS for the AWS Project are set forth in the Earned Value Management Plan, AWS-PL-U-00005 EVM Plan ("EVM Plan"), which was incorporated into Serco's contract.

18. EVMS is a program management tool designed to provide the government and its contractors with clear visibility into technical, cost and schedule planning, performance and progress on their contracts. Broadly, the EVMS includes a highly detailed projection of project

4

tasks, costs and completion dates, and a means of tracking the same items (including costs) as the project progresses. It allows one to track and compare actual costs incurred and project progress to projected and budgeted costs and schedule, in order to assess project progress and whether the project is proceeding on budget and on time, and to pinpoint sources of budget overruns and delays early so they can be rectified and overall cost contained. The EVMS requires the use of separate charge codes to document work done and expenses incurred for each task.

19. The key features of a viable EVMS include:

a. relating time-phased budgets to specific contract tasks;

b. alerting project managers to potential schedule and cost risks early;

c. documenting project performance;

d. providing quantitative data for decision making;

e. tracking and monitoring discrete project metrics;

f. enabling statistical estimation of completion costs;

g. communicating project status;

h. providing managers with information at a practical level of summarization; and

i. all reported information is valid, timely and able to be audited.

20. The EVMS is premised upon an Integrated Master Schedule (IMS), which sets forth the expectations of the project's performance and allows the project manager or Project Management Office ("PMO") to compare actual costs incurred to estimates concerning the costs and effort required to reach project milestones. A sound IMS contains contract milestones, accomplishments, discrete tasks and activities and is both vertically and horizontally traceable to a cost/schedule reporting system so it can be used to identify and assess variances.

21. The IMS is a tool that is utilized by the PMO to provide accurate and immediate, real-time information on the progress of the AWS project.

22. The EVMS and the IMS both critically depend upon a) breaking down the entire AWS Project into the many separate tasks and assigning costs to each task; b) keeping track of the costs actually incurred, once the work begins to complete those tasks; and c) keeping track of the progress of the work performed. The Defendants were required by the EVM Plan to develop

5

COMPLAINT

a "Work Breakdown Structure" ("WBS"), which was supposed to itemize and categorize each segment of the project into separate, reviewable levels. The lower the level number (for example, level 6), the more specific the work or milestone, and the higher the level number the more general each task is itemized. For example, level two might refer to all work associated with the 'Tucson Sector' and level five might include specific tasks in the Tucson Sector such as "install shelter equipment in South Mountain radio tower."

23. The IMS and related reporting tools were supposed to allow the PMO to monitor the costs actually incurred to achieve these tasks and to determine if the project is proceeding as planned, and further to pin point the source of delays or cost overruns. Should level two costs for the "Tucson Sector" for example exceed allowable variances from the budget, the PMO would be able to investigate further down the levels to identify where the variance exists and make appropriate adjustments before significant cost overruns or other waste occurs.

24. In order for the EVMS to serve its intended purpose and provide meaningful information to the PMO, the costs actually incurred to accomplish the tasks detailed in the IMS and the status of the tasks, had to be tracked. For that reason, the EVM Plan required the Defendants to develop separate task or "charge" codes for each uniquely identifiable cost at the "Control Account" level. (EVM Plan 2.1.2). For example, a Control Account might be created for 'site installation tasks' at a particular border tower. That Control Account would be assigned a different charge number than similar installation tasks at a different border tower. Similarly, 'hardware purchases' might be assigned a different Control Account from 'site installation tasks' to allow analysis of budgetary compliance with the different categories of work and the different locations (towers) where work is performed.

25. The EVMS Plan applicable to the AWS project contains the following requirement:

> 2.1.2: A task code charge number exists that uniquely identifies costs at the control account level and allows for accumulation and summarization of costs to higher levels of the WBS (NDIA guideline #17).

6
COMPLAINT

26. Pursuant to the EVM Plan, 1.3.2., each Control Account was required to be assigned to a Control Account Manager ("CAM") who would be responsible for managing and monitoring the collection of costs for each Control Account.

27. Defendants did not develop and implement a viable EVMS for the AWS Project. Defendants did not establish Control Accounts against which actual costs should have been tracked. Those costs could not be aggregated and compared to estimated costs and schedule. Instead, Defendants' employees were told to enter their time using a single charge code and all work on the AWS Project was billed to a single charge code.

28. Because no Control Accounts were utilized, all work was billed under a single charge code. The absence of unique charge codes made it impossible to identify, much less analyze cost schedule, performance or progress on the AWS project. In other words, the purpose and intent of the EMVS was completely circumvented.

29. The fundamental failure to create distinct Control Accounts and also unique individual Charge Codes relating to those Control Accounts completely undermined the entire purposed EVMS. Because Serco failed to establish Control Accounts in the first place, Defendant also did not assign separate CAMs to validate individual costs.

30. Because the raw data necessary for an effective EVMS was not being gathered, when Serco was required to prepare EVMS reports, Serco was compelled to and did create false and fraudulent data and reports. Serco employees essentially guessed at what data would appear plausible, and "plugged in" cost and other data as needed to make it appear the Project was proceeding relatively close to plan.

31. Time and costs were billed to the single cost account that were not incurred as part of the Project, but were falsely reported that way in billings and claims submitted to the government.

**B. EVMS Analysis and Reporting -- Defendants Generated and Submitted False Data and Reports**

32. Defendant is required to generate a Project Monthly Report (PMR), also known as a Contract Performance Report (CPR), on the 15th of each month. This report, based on the EVMS,

was intended to compare actual costs entered from accounting and timekeeping with work budgeted to allow for effective performance measurement. A valid PMR includes, among other items, the following:

    a.    A summary of the baseline cost and schedule data;

    b.    A summary of the status of the project, showing each phase, total budget, percent complete, expenditures, etc.;

    c.    The project Integrated master Schedule (IMS); and

    d.    The actual cost sheet.

33. All EVMS analysis, including the PMR is contingent on the validity of the information at the most basic input levels – the Charge Codes. The person in charge, the EVM lead, must check all levels of the WBS and focus on any errors in the data. Defendant's designated EVM lead was Raymond Day.

34. Because cost data was not being tracked as required -- for each task by means of Charge Codes specific to each task in the WBS -- when PMRs were prepared, Defendants falisifed the data included in the PMRs.

35. The Relator witnessed this first hand. Relator was employed by Serco at its San Diego, California facility. His position was that of an Earned Value Management Data Analyst, which provided him access to aspects of the EVMS. Relator commenced his work for Serco on or about November 2, 2009. His work on the AWS project commenced the following day on November 3, 2009.

36. In or around January 2010, Relator attended a meeting with the AWS team, including Denise Ellison. Ms. Ellison had the responsibility to merge the IMS with the Serco accounting system, including the creation of charge codes to record work performed at every level of the project. At this time, the accounting system was not yet merged, no unique charge codes had been created or assigned, and Ms. Ellison expressed frustration with an ability to accomplish these tasks while the IMS was not complete and continually subject to change.

37. As of January 2010, the AWS team had been using only one charge code for all work on the AWS project. For example, there should be different charge codes for level 5 tasks such as "1st Quarter (2011 Portal Maintenance)" and level four "Project Management February."

38. By February 2010, AWS team members were provided a new charge code for work performed on the AWS project. However, instead of a list of unique charge codes assigned to each task or area of work, team members were again instructed to use just the single charge code. This situation continued until at least Relator's termination more than a year later in May 2011.

39. AWS team members simply recorded total time worked during each day and applied it all to the single billing code without further description. In or around March 2011, and again in April 2011, Tom Helmen, Serco's AWS Project Lead, sent an e-mail to the AWS team, including Relator, requesting everyone to let him know which tasks relating to AWS each had worked on in the last month so they could be imputed into the IMS. This information should have been a function of the accounting system had proper charge codes been created and assigned to all tasks.

40. On at least one occasion, Relator heard a discussion between Tom Helmen and another AWS team member wherein the team member was instructed to bill all of her time worked at Serco to the AWS project even though she had barely worked on the project that month.

41. On March 16-17, 2010, an AWS Contract Performance Report Working Group Meeting was held. Present at this meeting were the Relator, the balance of his AWS team and representatives from CBP. The purpose of the meeting was to review the Contract Performance Report (CPR) for the month with the PMO.

42. During the meeting, the fact that data was being falsified in order to generate reports that showed the Project was progressing according to plan, was openly mentioned. Written minutes taken during the meeting confirm this; they included the statement that "$ amounts were plugged in at the end of the work packages in IMS to get CPI (Cost Performance Index) and SPI (Schedule Performance Index) to come out right."

9

COMPLAINT

43. During the same meeting, a representative from CBP inquired where the "actuals" supporting the summary figures were being collected. He was told "they were being collected in the Excel sheet and pushed out into the IMS." The project representatives were then informed that "the Excel sheet would be included on the PMO side of SharePoint monthly," as it was not available at the performance meeting. The Defendant intentionally materially misled the PMO when providing this answer. In fact the "actuals" the PMO asked about were neither accurate nor verifiable as Defendants were not tracking actual costs associated with specific tasks.

44. The data used to prepare the false and fraudulent reports provided to the PMO -- the "actuals" the PMO inquired about -- were manufactured by Defendants. In or around January 2011, Relator was asked to attend an IMS progress update session with the EVM lead, Raymond Day. The purpose of the meeting was to prepare for the monthly CPR for submission to the PMO and to provide support for a claim for payment made by Defendant.

45. In the update session, Relator was asked to sit at a computer and input costs into the IMS as dictated to him by the EVM lead. These costs, however, were not generated from timekeeping or accounting. Because only a single charge code was used for each and every task on the AWS project, Serco had no valid cost information for each budgeted line item. The result was that they had to reverse engineer the CPR. Instead of using actual and accurate data, random numbers were entered for the various budgeted line-items. As Relator was imputing made up costs for tasks at the more detailed levels of the IMS, the figures would affect the summary levels and reveal variances from the monthly budget and discrepancies with the schedule of events. The EVM lead tracked the shifting results throughout this process. When the costs input at the detailed levels created too much of a variance, the EVM lead instructed Relator to either increase or decrease costs or even reallocate them to other tasks so that the result would be within allowable or reasonable variances. This process confirmed that Serco was simply cooking the books to its own benefit.

### C. **Defendants' Deliberate Attempts to Mislead the CBP**

46. Defendant took definitive steps to obscure the lack of proper coding and the lack of a valid EVMS. The IMS was, by contract, to be visible to the PMO. As stated in the March 16-

17, 2010 AWS Contract Performance meeting, however, the PMO was not provided access to "the actuals" that supported the summarized costs. Instead, the PMO was initially shown only the summary costs that Defendant passed off as being verified results. Later, an Excel Spreadsheet was provided, but that too lacked validity.

47. Defendant structured the IMS as a series of subprojects within a master project format. Defendants provided the IMS to the PMO as a .pdf; i.e., in a fixed format such that the PMO could not work or use the underlying software and detect the absence of real underlying data. This exponentially increased the file size of the IMS, making it impossible to transfer. The only way to access the IMS in its entirety was through the project server housed at Serco, which again made meaningful review that much more difficult for the PMO

48. As a result of Defendants' actions, the United States has received an invalid and non-operational EVMS. The purported EVMS created by Defendants provides no means of evaluating the performance of the AWS project as actual costs were not tracked and the made up costs included in the reports Defendants generated cannot be validated or relied upon. .

49. Defendants have nevertheless billed the United States for the creation of a functioning EVMS and submitted claims for payment for services Defendants did not provide. Defendants have also submitted claims that included costs incurred on other projects, not incurred in connection with the AWS Project. And Defendants have created and utilized false documents to support their false claims.

## V.
## CLAIMS FOR RELIEF

### Count 1

Submitting False Claims in Violation of the False Claims Act,
31 U.S.C. section 3729(a)(1)(A)

50. The allegations contained in paragraphs 1 through 49 are incorporated by reference as if fully set forth herein.

51. Through the acts described above, Defendant knowingly presented, or caused to be presented, to the United States, false or fraudulent claims for payment or approval. Specifically,

and as described more fully above, Defendants presented, or caused to be presented, claims for payment for project management services on the AWS project, which Defendant knew, recklessly disregarded, or deliberately ignored were false, and unverified.

52. By virtue of these false or fraudulent claims, the United States has suffered damages in an amount to be determined at trial. The United States is entitled to damages equal to the full price the United States has paid for Serco's work on the AWS project.

Wherefore, Relator prays for relief as set forth below.

## Count 2

Making False Records Material to a False or Fraudulent Claim
in Violation of the False Claims Act,
31 U.S.C. section 3729(a)(1)(B)

53. The allegations in paragraphs 1 through 52 are incorporated by reference as if fully set forth herein.

54. As set forth above, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to the United States.

55. By virtue of these false records or statements made to get a claim paid, the United States has suffered damages in an amount to be determined at trial. The United States is entitled to damages equal to the full price the United States has paid for Serco's work on the AWS project.

Wherefore, Relator prays for relief as set forth below.

## Count 3

Conspiring to Violate the False Claims Act,
31 U.S.C. section 3729(a)(1)(C)

56. The allegations in paragraphs 1 through 55 are incorporated by reference as is fully set forth herein.

57. Defendant conspired to defraud the United States by submitting false and fraudulent claims for payment.

58. By virtue of Defendant's conspiracy, the United States has suffered damages in an amount to be determined at trial.

Wherefore, Relator prays for relief as set forth below.

## Count 4

Retention of Overpayments in Violate the False Claims Act,
31 U.S.C. section 3729(a)(1)(G)

59. The allegations in paragraphs 1 through 58 are incorporated by reference as is fully set forth herein.

60. Defendant knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States by failing to report the deficiencies in the EVMS, by failing to return to the United States monies the Defendant has received for the invalid EVMS and improper billing after Defendant learned of the resulting overpayments.

61. By virtue of Defendant's conspiracy, the United States has suffered damages in an amount to be determined at trial.

Wherefore, Relator prays for relief as set forth below

## RELIEF REQUESTED

62. Relator prays for judgment against Defendant as follows:

a. For damages in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's unlawful conduct;

b. For civil monetary penalties for each false and fraudulent claim submitted to the United States;

c. For a permanent injunction, enjoining Defendant from violating the federal False Claims Act;

d. For Relator's attorneys' fees and costs;

e. For an order awarding Relator the maximum award allowed by the False Claims Act; and

f. For such further relief as the Court may deem proper and just.

## CLAIM OF RIGHT FOR TRIAL BY JURY

63.  Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

DATED: December 21, 2011

EMGE & ASSOCIATES
DEREK J. EMGE

*/s/ Derek J. Emge*

DEREK J. EMGE

525 B Street, Suite 760
San Diego, CA  92101
Telephone:   (619) 595-1400
Facsimile:     (619) 595-1480

Attorneys for Plaintiff

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provid by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiati the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA, Ex Rel. [UNDER SEAL] | [UNDER SEAL] [Filed Under Seal Pursuant To 31 Section 3730(b)(2)] |
| (b) County of Residence of First Listed Plaintiff  SAN DIEGO  *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant  SAN DIEGO  *(IN U.S. PLAINTIFF CASES ONLY)*  NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| (c) Attorneys *(Firm Name, Address, and Telephone Number)*  DEREK J. EMGE  EMGE & ASSOCIATES  SBN:161105  525 B St., Ste.760, San Diego CA 92101  619 595 1400 | Attorneys *(If Known)*  '11 CV 2975 WQH JMA |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** / **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act / ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations / ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act / ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act / ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation / ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. 3729

Brief description of cause:
Qui Tam Action

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*:
JUDGE _____   DOCKET NUMBER _____

DATE 12/21/11

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 33684   AMOUNT $350   APPLYING IFP ____   JUDGE ____   MAG. JUDGE ____

AB 12/21/11

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS033689
Cashier ID: mbain
Transaction Date: 12/21/2011
Payer Name: EMGE ASSOCIATES
------------------------------------
CIVIL FILING FEE
 For: EMGE ASSOCIATES
 Case/Party: D-CAS-3-11-CV-002979-001
 Amount:       $350.00
------------------------------------
CHECK
 Check/Money Order Num: 3964
 Amt Tendered:  $350.00
------------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```