Derek J. Emge, SBN 161105
EMGE & ASSOCIATES
225 Broadway, Suite 1350
San Diego, CA  92101
Telephone:     (619) 595-1400
Facsimile:      (619) 595-1480

Wayne T. Lamprey, SBN 95408
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY
505 Sansome Street, Suite 900
San Francisco, CA  94111
Telephone:     (415) 392-7900
Facsimile:      (415) 398-4321

Attorneys for Relator
DARRYN KELLY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNDER UNITED STATES OF AMERICA *ex rel*. DARRYN KELLY,<br><br>Plaintiffs,<br><br>v.<br><br>SERCO INC, a New Jersey Corporation; and DOES 1-5,<br><br>Defendants. | CASE NO.:  11-CV-2975-WQH-RBB<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES:**<br><br>1. **VIOLATION OF THE FALSE CLAIMS ACT**<br><br>2. **UNLAWFUL RETALITION (GOV'T CODE § 12653(b))**<br><br>3. **UNLAWFUL RETALIATORY DISCHARGE (CAL. LAB. CODE § 1102.5)**<br><br>4. **TERMINATION IN VIOLATION OF PUBLIC POLICY**<br><br>5. **BREACH OF CONTRACT OF CONTINUED EMPLOYMENT**<br><br>6. **CLAIM OF RIGHT FOR TRIAL BY JURY** |

-1-

Plaintiff, Darryn Kelly, in his capacity as a Relator ("Relator"), files this First Amended Complaint against Defendant and alleges as follows:

## I.

## INTRODUCTION

1. This action is brought on behalf of the United States to recover damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. Sections 3729, *et seq.* (hereinafter "the Act") and the unlawful retaliatory discharge of Relator.

2. Defendant Serco, Inc. ("Serco") submitted false and fraudulent claims for payment to agencies of the United States, including but not limited to the Department of Homeland Security ("DHS") and the United States Customs and Border Protection ("CBP"), in connection with project management services Serco contracted to provide for the Advanced Wireless System (AWS) Spectrum Relocation Project ("AWS Project"), and created false and fraudulent records in support of its claims. Defendant failed to put in place a sound Earned Value Management System (EVMS") as part of its project management services as required by its contract, including failing to create charge accounts and methods of tracking work and costs associated with the AWS Project, and because such system of coding charges did not exist, Serco created false and fraudulent data and reports. As a result of Defendant's fraudulent conduct and misrepresentations and knowing submissions of false claims, the United States has overpaid for services that were rendered and has paid for services that have never been rendered.

3. Relator brings this action on behalf of the United States pursuant to the "qui tam" provisions of the Act. Those provisions allow and empower individuals with knowledge of violations of the Act to file suit on behalf of the government, and, to encourage individuals to do so, provided that these individuals are to share in any resulting recovery.

4. Relator estimates that the government has sustained damages as a result of the violations alleged below that are well in excess of $10 million before trebling pursuant to the Act, and excluding penalties.

///

///

**II.**

**PARTIES**

5. Relator Darryn Kelly is an individual and a resident of San Diego County, California. He was employed by Defendant Serco, Inc. ("Serco" or "Defendant") as an Earned Value Management Data Analyst at its facilities in San Diego, California. His position as an analyst required him to identify and investigate deviations from the EVMS with respect to project management for the AWS Project.

6. Defendant Serco, Inc. is a corporation organized and operating under the laws of the State of New Jersey with its principal West Coast place of business in San Diego, California.

7. Relator is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 5, inclusive, and therefore sues these Defendants by such fictitious names. Relator will amend this First Amended Complaint to allege the true names and capacities of these Defendants when ascertained. Relator is informed and believes that each of the fictitiously named Defendants is legally liable as alleged herein.

8. "Defendant" and "Serco," as used herein, refers to Defendants Serco, Inc. and Does 1 through 5, collectively.

9. At all times mentioned herein, unless otherwise stated, each Defendant was the agent of each of its Co-defendants, and in doing the things herein mentioned, was acting within the scope of its authority as such an agent, and with the permission and consent of its Co-defendants.

**III.**

**JURISDICTION AND VENUE**

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. Section 1331 (federal question jurisdiction) and 31 U.S.C. Section 3732 (federal court jurisdiction for actions brought pursuant to 31 U.S.C. Section 3730).

11. Venue is proper in this district pursuant to 31 U.S.C. Section 3732(a), because Defendant can be found in this district and transacts business in this district as alleged in this First Amended Complaint, and under 28 U.S.C. Sections 1391(b) and 1395(a).

## IV.

## ALLEGATIONS COMMON TO ALL CLAIMS

A. **The AWS Relocation Project, Serco's Role, Project Management and Earned Value Management System (EVMS)**

12. Plaintiff United States of America, by and through its agencies including but not limited to the DHS and, more specifically, the CBP, has entered into contracts to have Defendant provide project management for the retrofitting and upgrading of communications towers along the United States' border with Mexico, a project known as the Advanced Wireless Services ("AWS") Spectrum Relocation Project ("AWS Project").

13. The AWS Project was intended to create a "virtual border" between the United States and Mexico by installing sophisticated electronic equipment along the border on existing towers and facilities. The project was part of the "Virtual Border Mission" and overseen by the CBP.

14. The contract for the current phase of the AWS Project was awarded in the amount of approximately $52 million.

15. Serco was hired in connection with the AWS Project to provide critical project management functions to help ensure that the project proceeded as planned and on budget – and to identify immediately when variances and problems occurred.

16. As part of its project management duties, and as required by its contract, Serco was required to develop and put in place a management tool referred to as an Earned Value Management System ("EVMS"). The United States requires EVMS to help the government monitor projects and avoid unnecessary schedule delays and cost overruns.

17. The parameters and requirements of EVMS for the AWS Project are set forth in the Earned Value Management Plan, AWS-PL-U-00005 EVM Plan ("EVM Plan"), which was incorporated into Serco's contract.

18. EVMS is a program management tool designed to provide the government and its contractors with clear visibility into technical, cost and schedule planning, performance and progress on their contracts. Broadly, the EVMS includes a highly detailed projection of project

-4-

tasks, costs and completion dates, and a means of tracking the same items (including costs) as the project progresses. It allows one to track and compare actual costs incurred and project progress to projected and budgeted costs and schedule, in order to assess project progress and whether the project is proceeding on budget and on time, and to pinpoint sources of budget overruns and delays early so they can be rectified and overall cost contained. The EVMS requires the use of separate charge codes to document work done and expenses incurred for each task.

19. The key features of a viable EVMS include:
  a. relating time-phased budgets to specific contract tasks;
  b. alerting project managers to potential schedule and cost risks early;
  c. documenting project performance;
  d. providing quantitative data for decision making;
  e. tracking and monitoring discrete project metrics;
  f. enabling statistical estimation of completion costs;
  g. communicating project status;
  h. providing managers with information at a practical level of summarization; and
  i. all reported information is valid, timely and able to be audited.

20. The EVMS is premised upon an Integrated Master Schedule (IMS), which sets forth the expectations of the project's performance and allows the project manager or Project Management Office ("PMO") to compare actual costs incurred to estimates concerning the costs and effort required to reach project milestones. A sound IMS contains contract milestones, accomplishments, discrete tasks and activities and is both vertically and horizontally traceable to a cost/schedule reporting system so it can be used to identify and assess variances.

21. The IMS is a tool that is utilized by the PMO to provide accurate and immediate, real-time information on the progress of the AWS project.

22. The EVMS and the IMS both critically depend upon: a) breaking down the entire AWS Project into the many separate tasks and assigning costs to each task; b) keeping track of the costs actually incurred, once the work begins to complete those tasks; and c) keeping track of

-5-

1 the progress of the work performed.  The Defendant was required by the EVM Plan to develop a
2 "Work Breakdown Structure" ("WBS"), which was supposed to itemize and categorize each
3 segment of the project into separate, reviewable levels.  The lower the level number (for example,
4 Level 6), the more specific the work or milestone, and the higher the level number the more
5 general each task is itemized.  For example, Level 2 might refer to all work associated with the
6 "Tucson Sector" and Level 5 might include specific tasks in the Tucson Sector such as "install
7 shelter equipment in South Mountain radio tower."

8   23.   The IMS and related reporting tools were supposed to allow the PMO to monitor
the costs actually incurred to achieve these tasks and to determine if the project is proceeding as
planned, and further to pinpoint the source of delays or cost overruns.  Should Level 2 costs for
the "Tucson Sector," for example, exceed allowable variances from the budget, the PMO would
be able to investigate further down the levels to identify where the variance exists and make
appropriate adjustments before significant cost overruns or other waste occurs.

  24.   In order for the EVMS to serve its intended purpose and provide meaningful
information to the PMO, the costs actually incurred to accomplish the tasks detailed in the IMS
and the status of the tasks, had to be tracked.  For that reason, the EVM Plan required the
Defendant to develop separate task or "charge" codes for each uniquely identifiable cost at the
"Control Account" level (EVM Plan 2.1.2).  For example, a Control Account might be created for
"site installation tasks" at a particular border tower.  That Control Account would be assigned a
different charge number than similar installation tasks at a different border tower.  Similarly,
"hardware purchases" might be assigned a different Control Account from "site installation tasks"
to allow analysis of budgetary compliance with the different categories of work and the different
locations (towers) where work is performed.

  25.   The EVMS Plan applicable to the AWS Project contains the following
requirement:

> 2.1.2:  A task code charge number exists that uniquely identifies costs at the control account level and allows for accumulation and summarization of costs to higher levels of the WBS (NDIA guideline #17).

-6-

**FIRST AMENDED COMPLAINT**                                       **CASE NO.:  11-CV-2975-WQH-RBB**

26. Pursuant to the EVM Plan 1.3.2., each Control Account was required to be assigned to a Control Account Manager ("CAM") who would be responsible for managing and monitoring the collection of costs for each Control Account.

27. Defendant did not develop and implement a viable EVMS for the AWS Project. Defendant did not establish Control Accounts against which actual costs should have been tracked. Those costs could not be aggregated and compared to estimated costs and schedule. Instead, Defendant's employees were told to enter their time using a single charge code and all work on the AWS Project was billed to a single charge code.

28. Because no Control Accounts were utilized, all work was billed under a single charge code. The absence of unique charge codes made it impossible to identify, much less analyze cost schedule, performance or progress on the AWS Project. In other words, the purpose and intent of the EMVS was completely circumvented.

29. The fundamental failure to create distinct Control Accounts and also unique individual Charge Codes relating to those Control Accounts completely undermined the entire purposed EVMS. Because Serco failed to establish Control Accounts in the first place, Defendant also did not assign separate CAMs to validate individual costs.

30. Because the raw data necessary for an effective EVMS was not being gathered when Serco was required to prepare EVMS reports, Serco was compelled to and did create false and fraudulent data and reports. Serco employees essentially guessed at what data would appear plausible and "plugged in" costs and other data as needed to make it appear the Project was proceeding relatively close to plan.

31. Time and costs were billed to the single cost account that were not incurred as part of the Project, but were falsely reported that way in billings and claims submitted to the government.

   B.   **EVMS Analysis and Reporting – Defendant Generated and Submitted False Data and Reports**

32. Defendant is required to generate a Project Monthly Report (PMR), also known as a Contract Performance Report (CPR), on the 15th of each month. This report, based on the

-7-

EVMS, was intended to compare actual costs entered from accounting and timekeeping with work budgeted to allow for effective performance measurement.  A valid PMR includes, among other items, the following:

    a.    a summary of the baseline cost and schedule data;

    b.    a summary of the status of the project, showing each phase, total budget, percentage complete, expenditures, etc.;

    c.    the project Integrated Master Schedule (IMS); and

    d.    the actual cost sheet.

33. All EVMS analyses, including the PMR, are contingent on the validity of the information at the most basic input levels – the Charge Codes. The person in charge, the EVM lead, must check all levels of the WBS and focus on any errors in the data. Defendant's designated EVM lead was Raymond Day.

34. Because cost data was not being tracked as required – for each task by means of Charge Codes specific to each task in the WBS – when PMRs were prepared, Defendant falsified the data included in the PMRs.

35. The Relator witnessed this first-hand. Relator was employed by Serco at its San Diego, California facility. His position was that of an Earned Value Management Data Analyst, which provided him access to aspects of the EVMS. Relator commenced his work for Serco on or about November 2, 2009. His work on the AWS Project commenced the following day on November 3, 2009.

36. In or around January 2010, Relator attended a meeting with the AWS team, including Denise Ellison. Ms. Ellison had the responsibility to merge the IMS with the Serco accounting system, including the creation of Charge Codes to record work performed at every level of the project. At this time, the accounting system was not yet merged, no unique Charge Codes had been created or assigned, and Ms. Ellison expressed frustration with an ability to accomplish these tasks while the IMS was not complete and continually subject to change.

///

///

37. As of January 2010, the AWS team had been using only one Charge Code for all work on the AWS Project. For example, there should be different Charge Codes for Level 5 tasks such as "1st Quarter (2011 Portal Maintenance)" and Level 4 "Project Management February."

38. By February 2010, AWS team members were provided a new Charge Code for work performed on the AWS Project. However, instead of a list of unique Charge Codes assigned to each task or area of work, team members were again instructed to use just the single Charge Code. This situation continued until at least Relator's termination more than a year later, in May 2011.

39. AWS team members simply recorded total time worked during each day and applied it all to the single billing code without further description. In or around March 2011, and again in April 2011, Tom Helmen, Serco's AWS Project Lead, sent an e-mail to the AWS team, including Relator, requesting everyone to let him know which tasks relating to AWS each had worked on in the last month so they could be imputed into the IMS. This information should have been a function of the accounting system had proper charge codes been created and assigned to all tasks.

40. On at least one occasion, Relator heard a discussion between Tom Helmen and another AWS team member, wherein the team member was instructed to bill all of her time worked at Serco to the AWS Project even though she had barely worked on the project that month.

41. On March 16-17, 2010, an AWS Contract Performance Report Working Group Meeting was held. Present at this meeting were the Relator, the balance of his AWS team and representatives from CBP. The purpose of the meeting was to review the Contract Performance Report (CPR) for the month with the PMO.

42. During the meeting, the fact that data was being falsified in order to generate reports that showed the project was progressing according to plan was openly mentioned. Written minutes taken during the meeting confirm this; they included the statement that "$ amounts were plugged in at the end of the work packages in IMS to get CPI (Cost Performance Index) and SPI (Schedule Performance Index) to come out right."

**FIRST AMENDED COMPLAINT**                              CASE NO.: 11-CV-2975-WQH-RBB

43. During the same meeting, a representative from CBP inquired where the "actuals" supporting the summary figures were being collected. He was told "they were being collected in the Excel sheet and pushed out into the IMS." The project representatives were then informed that "the Excel sheet would be included on the PMO side of SharePoint monthly," as it was not available at the performance meeting. The Defendant intentionally materially misled the PMO when providing this answer. In fact the "actuals" the PMO asked about were neither accurate nor verifiable as Defendant was not tracking actual costs associated with specific tasks.

44. The data used to prepare the false and fraudulent reports provided to the PMO – the "actuals" the PMO inquired about – were manufactured by Defendant. In or around January 2011, Relator was asked to attend an IMS progress update session with the EVM lead, Raymond Day. The purpose of the meeting was to prepare for the monthly CPR for submission to the PMO and to provide support for a claim for payment made by Defendant.

45. In the update session, Relator was asked to sit at a computer and input costs into the IMS as dictated to him by the EVM lead. These costs, however, were not generated from timekeeping or accounting. Because only a single Charge Code was used for each and every task on the AWS Project, Serco had no valid cost information for each budgeted line item. The result was that it had to reverse engineer the CPR. Instead of using actual and accurate data, random numbers were entered for the various budgeted line items. As Relator was imputing made-up costs for tasks at the more detailed levels of the IMS, the figures would affect the summary levels and reveal variances from the monthly budget and discrepancies with the schedule of events. The EVM lead tracked the shifting results throughout this process. When the costs inputted at the detailed levels created too much of a variance, the EVM lead instructed Relator to either increase or decrease costs or even reallocate them to other tasks so that the result would be within allowable or reasonable variances. This process confirmed that Serco was simply cooking the books to its own benefit.

46. In March 2011, Relator warned his supervisor, Tom Helman, that the EVM plan was not in compliance. At that time, no action was taken to revise the EVM plan and, no one addressed Relator's analysis or recommendations.

47. In middle of March 2011, Relator performed an in-depth analysis of the IMS and identified several tasks that either had their budget or schedule adjusted, and had been omitted from Raymond Day's "Change Log Report." Relator put his analysis into a report entitled "Change Log Audit" and sent it to his supervisor, Tom Helman, and his coworkers, Colleen Christensen and John Pryor. Relator never received a direct response to his accusation and realized that none of them were willing to address the issue that he had identified relating to Raymond Day's adjustments of the resource allocations. After Relator sent out his Change Log Audit, he was no longer included in meetings about the project.

48. In or around April 12, 2011, Relator contacted Terri Van, a consultant for the California Border Protection ("CBP"), and told her that the resource allocations were being adjusted in order to make the EVM look better.

49. During the third week of April 2011, as a result of Relator's phone conversation with Ms. Van, the government's Project Management Office ("PMO") began to question Serco. Serco suspected Relator of tipping the PMO off about the issues that he had uncovered.

50. During the first week of May 2011, Tom Helmen, Denise Ellison and Francisco Magana told Relator that SPAWAR and the PMO had agreed that Serco would no longer be performing EVM on the AWS Project and therefore, his position was being eliminated, and he was being laid off.

51. Relator's layoff was a result of his whistleblowing concerning the analysis contained his Change Log Audit and was direct retaliation for it.

52. As a direct and foreseeable result of his termination by Serco, Inc., Relator has lost earnings and other employment benefits, as well as experienced other economic losses and non-economic losses, including but not limited to humiliation, embarrassment, and mental anguish.

### C. Defendant's Deliberate Attempts to Mislead the CBP

53. Defendant took definitive steps to obscure the lack of proper coding and the lack of a valid EVMS. The IMS was, by contract, to be visible to the PMO. As stated in the March 16-17, 2010 AWS Contract Performance Meeting, however, the PMO was not provided

-11-

access to "the actuals" that supported the summarized costs. Instead, the PMO was initially shown only the summary costs that Defendant passed off as being verified results. Later, an Excel Spreadsheet was provided, but that too lacked validity.

54. Defendant structured the IMS as a series of subprojects within a master project format. Defendant provided the IMS to the PMO as a .pdf; i.e., in a fixed format such that the PMO could not work or use the underlying software and detect the absence of real underlying data. This exponentially increased the file size of the IMS, making it impossible to transfer. The only way to access the IMS in its entirety was through the project server housed at Serco, which again made meaningful review that much more difficult for the PMO.

55. As a result of Defendant's actions, the United States has received an invalid and non-operational EVMS. The purported EVMS created by Defendant provides no means of evaluating the performance of the AWS Project, as actual costs were not tracked and the made-up costs included in the reports Defendant generated cannot be validated or relied upon.

56. Defendant has nevertheless billed the United States for the creation of a functioning EVMS and submitted claims for payment for services Defendant did not provide. Defendant has also submitted claims that included costs incurred on other projects, not incurred in connection with the AWS Project, and Defendant has created and utilized false documents to support its false claims.

V.

**CLAIMS FOR RELIEF**

**Count 1**

Submitting False Claims in Violation of the False Claims Act
31 U.S.C. Section 3729(a)(1)(A)

57. The allegations contained in Paragraphs 1 through 56 are incorporated by reference as if fully set forth herein.

58. Through the acts described above, Defendant knowingly presented, or caused to be presented, to the United States false or fraudulent claims for payment or approval. Specifically, and as described more fully above, Defendant presented, or caused to be presented, claims for

-12-

1  payment for project management services on the AWS Project, which Defendant knew, recklessly
2  disregarded, or deliberately ignored were false, and unverified.

3  59.  By virtue of these false or fraudulent claims, the United States has suffered
4  damages in an amount to be determined at trial. The United States is entitled to damages equal to
5  the full price the United States has paid for Serco's work on the AWS Project.

6  WHEREFORE, Relator prays for relief as set forth below.

### Count 2

Making False Records Material to a False or Fraudulent Claim
in Violation of the False Claims Act
31 U.S.C. Section 3729(a)(1)(B)

10  60.  The allegations in Paragraphs 1 through 59 are incorporated by reference as if fully
11  set forth herein.

12  61.  As set forth above, Defendant knowingly made, used, or caused to be made or
13  used, a false record or statement material to a false or fraudulent claim to the United States.

14  62.  By virtue of these false records or statements made to get a claim paid, the United
15  States has suffered damages in an amount to be determined at trial. The United States is entitled
16  to damages equal to the full price the United States has paid for Serco's work on the AWS
17  project.

18  WHEREFORE, Relator prays for relief as set forth below.

### Count 3

Conspiring to Violate the False Claims Act
31 U.S.C. Section 3729(a)(1)(C)

22  63.  The allegations in Paragraphs 1 through 62 are incorporated by reference as is
23  fully set forth herein.

24  64.  Defendant conspired to defraud the United States by submitting false and
25  fraudulent claims for payment.

26  65.  By virtue of Defendant's conspiracy, the United States has suffered damages in an
27  amount to be determined at trial.

28  WHEREFORE, Relator prays for relief as set forth below.

**FIRST AMENDED COMPLAINT**　　　　　　　　　　　　　　　　**CASE NO.:  11-CV-2975-WQH-RBB**

## Count 4

Retention of Overpayments in Violation of the False Claims Act
31 U.S.C. Section 3729(a)(1)(G)

66. The allegations in Paragraphs 1 through 65 are incorporated by reference as is fully set forth herein.

67. Defendant knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States by failing to report the deficiencies in the EVMS, by failing to return to the United States monies the Defendant has received for the invalid EVMS and improper billing after Defendant learned of the resulting overpayments.

68. By virtue of Defendant's conspiracy, the United States has suffered damages in an amount to be determined at trial.

WHEREFORE, Relator prays for relief as set forth below.

## Count 5

Retaliation in Violation of Government Code Section 12653(b)

69. The allegations in Paragraphs 1 through 68 are incorporated by reference as is fully set forth herein.

70. The acts of Relator described above were lawful acts done by him as an employee of Serco to prevent and investigate the conduct and assist in a possible action pursuant to Government Code Section 12652.

71. As a direct and proximate result of Relator's actions, Defendant, in violation of California Government Code Section 12653(b), harassed and otherwise coerced Relator to engage in the activity to which he objected, and discharged retaliated against him, because of lawful acts done by Relator in disclosing information to a government agency and acts in furtherance of a potential false claims action, including investigating matters for initiation and assistance in filing a false claim action.

72. As a proximate result of Defendant's conduct, Relator has suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental

-14-

anguish, as well as incurred attorneys' fees, all to his damage in an amount to be established at trial.

73.   In doing the acts set forth above, Defendant despicably subjected Relator to cruel and unjust hardship in conscious disregard of Relator's rights by terminating Relator's employment when Relator refused to engage in fraudulent accounting practices directed by Defendant. With respect to Defendant Serco, this oppressive conduct was committed by individuals who were managing agents of Serco. Defendant's conduct warrants the assessment of punitive damages.

74.   Pursuant to Government Code Section 12653, Defendant is liable for all relief necessary to make Relator whole, including reinstatement, two times the amount of back pay, interest on the back pay, compensation for special damages, punitive damages, Relator's litigation costs and reasonable attorneys' fees.

WHEREFORE, Relator prays for relief as set forth below.

**Count 6**

Unlawful Retaliatory Discharge
Cal. Labor Code § 1102.5

75.   The allegations contained in Paragraphs 1 through 74 are incorporated by reference as if fully set forth herein.

76.   Relator refused to participate in the fraudulent practices of Serco, Inc. that violated state statutes and regulations and resulted in violations of such statutes and regulations, including but not limited to the False Claims Act.

77.   Defendant knew that Relator had refused to participate in the illegal and fraudulent practices and had made complaints regarding Serco's actions.

78.   As a direct and proximate result of Relator's refusal and disclosures, Defendant, in violation of California Labor Code Section 1102.5(c) and (d), and without any legitimate and independent reason, unlawfully retaliated against Relator by terminating his employment.

79.   As a proximate result of Defendant's conduct, Relator has suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental

anguish, as well as incurred attorneys' fees, all to his damage in an amount to be established at trial.

WHEREFORE, Relator prays for relief as set forth below.

## Count 7

Termination in Violation of Public Policy

80. The allegations contained in Paragraphs 1 through 79 are incorporated by reference as if fully set forth herein.

81. From November 2, 2009 to May 2011, Relator was employed by Defendant Serco as an Earned Value Management Data Analyst.

82. As set forth in more detail above, during the course of his employment, Relator protested illegal and false claims made on the government by Serco.

83. The actions Defendant directed Relator and others to engage in, including fraudulent accounting in violation of the terms of the contract governing Serco's work on the project, resulted in unlawful false claims by Serco.

84. As a proximate result of Relator's conduct as described above, and in violation of the public policies set forth above, Defendant terminated Relator's employment in May 2011.

85. As a proximate result of Defendant's conduct, Relator has suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental anguish, all to his damage in an amount to be established at trial.

86. In doing the acts set forth above, Defendant knew that the conduct it was engaging in, to which Relator objected, was contrary to public policy designed to prevent fraudulent claims on the government and required Relator to choose between violating that public policy and losing his job. Notwithstanding this knowledge, Defendant despicably subjected Relator to cruel and unjust hardship in conscious disregard of Relator's rights by terminating Relator's employment when Relator protested the improper accounting methods directed by Defendant. With respect to Defendant Serco, this oppressive conduct was committed by managing agents of Serco. Defendant's conduct warrants the assessment of punitive damages.

WHEREFORE, Relator prays for relief as set forth below.

-16-

FIRST AMENDED COMPLAINT                              CASE NO.:  11-CV-2975-WQH-RBB

# Count 8

Breach of Contract of Continued Employment

87. The allegations contained in Paragraphs 1 through 86 are incorporated by reference as if fully set forth herein.

88. Relator was employed by Serco for a year and a half pursuant to an oral and implied in fact contract. Relator received only one review during his employment at Serco. In February 2011, only two months before he was terminated, he received a good review and a $2,500 pay increase. Relator was assured on numerous occasions that he would not be terminated arbitrarily, and relied on the provisions of Serco's personnel manual regarding the causes for which employees could be discharged, which provided that Relator would not be discharged unless there was good cause to do so.

89. Based on the oral representations, promises, and conduct of Defendant, Relator had an employment contract with Serco that he would be employed by Defendant so long as his performance was satisfactory, and that Defendant would not discharge him without good and just cause.

90. Relator at all times fulfilled his duties and conditions under the contract and has been ready, willing, and able to continue performing them in a competent and satisfactory manner.

91. Notwithstanding the implied promise to terminate the employment contract only for good cause, on or about May 2011, Serco terminated Relator's employment without good cause.

92. As a proximate result of Defendant's breach of the employment contract, Relator has suffered and continues to suffer losses of earnings and other employment benefits, to his damage in an amount to be established at trial.

WHEREFORE, Relator prays for relief as set forth below.

/ / /

/ / /

/ / /

## RELIEF REQUESTED

93.     Relator prays for judgment against Defendant as follows:

   a.   For damages in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's unlawful conduct;

   b.   For civil monetary penalties for each false and fraudulent claim submitted to the United States;

   c.   For a permanent injunction, enjoining Defendant from violating the federal False Claims Act;

   d.   For general and special damages in an amount subject to proof at trial, including but not limited to lost earnings and other employment benefits, past and future; costs of seeking other employment; and damages for emotional distress, humiliation, and mental anguish;

   e.   For civil penalties pursuant to California Labor Code Section 1102.5(f) against Defendant Serco, Inc.;

   f.   For the relief provided in Government Code Section 12653(c);

   g.   For interest at the legal rate subject to proof at trial;

   h.   For punitive damages;

   i.   For Relator's attorneys' fees and costs;

   j.   For an order awarding Relator the maximum award allowed by the False Claims Act; and

   k.   For such further relief as the Court may deem proper and just.

## CLAIM OF RIGHT FOR TRIAL BY JURY

94.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

DATED: September 7, 2012          EMGE & ASSOCIATES

                                  _____/s/ Derek J. Emge_____
                                  Derek J. Emge

                                  Attorneys for Relator
                                  DARRYN KELLY

-18-

**FIRST AMENDED COMPLAINT**                **CASE NO.: 11-CV-2975-WQH-RBB**