1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

10

UNITED STATES OF AMERICA *ex rel.* DARRYN KELLY,

11

Plaintiff,

12

vs.

13

SERCO, INC., a New Jersey Corporation, and DOES 1-5,

14

Defendant.

CASE NO. 11cv2975 WQH-RBB

ORDER

15

HAYES, Judge:

16     The matters before the Court are Defendant Serco, Inc.'s Motion for Summary

17  Judgment (ECF No. 65), Motions to File Documents Under Seal in support of its

18  motion and reply (ECF Nos. 63, 68), and Motion to Strike testimony of Relator's

19  expert, Kevin Martin (ECF No. 71).

20  **I. Background**

21     On December 21, 2011, Relator Darryn Kelly, suing on behalf of the United

22  States, initiated this action against Defendant Serco, Inc. based on the False Claims Act

23  ("FCA") by filing a Complaint in this Court under seal.  (ECF No. 3).  On August 9,

24  2012, the Court ordered that the complaint be unsealed because the United States

25  declined to intervene.  (ECF No. 8).  On September 7, 2012, Relator filed a First

26  Amended Complaint ("FAC"). (ECF No. 11).  The FAC alleges that Defendant tracked

27  its time and costs pursuant to a government project in an unreliable and fraudulent

28  manner by failing to follow the government's reporting requirements.  Specifically,

Defendant haphazardly collected time entries, fraudulently reallocated time among various tasks codes, and failed to track time in an automated system with the task codes that the government required.  The FAC alleges that Relator reported these actions to a Department of Homeland Security ("DHS") employee, and Defendant retaliated by terminating him three weeks later.

The FAC asserts the following claims for relief: (1) submitting false claims in violation of the FCA, (2) making false records material to a false or fraudulent claim in violation of the FCA, (3) conspiring to violate the FCA, (4) retention of overpayments in violation of the FCA, (5) retaliation in violation of California Government Code section 12653(b), (6) unlawful retaliatory discharge in violation of California Labor Code section 1102.5, (7) termination in violation of public policy, and (8) breach of contract of continued employment.  Defendant moves for summary judgment on all of Relator's claims.

On April 21, 2014, Defendant filed the Motion for Summary Judgment (ECF No. 65) concurrently with the Motion to File Documents Under Seal (ECF No. 63).  On May 5, 2014, Relator filed an opposition.  (ECF No. 66).  On May 12, 2014, Defendant filed a reply with the Motion to File Documents under Seal and the Motion to Strike.  (ECF Nos. 68, 70, 71).  On May 16, 2014, Relator filed an opposition to the Motion to Strike.  (ECF No. 72).  On May 27, 2014, Defendant filed a reply in support of the Motion to Strike.  (ECF No. 75).

**II.  Facts**

**A.  The AWS Project**

On an unspecified date, the Department of Homeland Security ("DHS") contracted the U.S. Navy, Space and Naval Warfare Systems ("SPAWAR") to upgrade the wireless communications systems in towers and facilities situated along the U.S./Mexico border.  (Serco's SSUF ¶¶ 1-3, ECF No. 70-1 at 2-3).  This project became known as the Advanced Wireless Systems Spectrum Relocation Project ("AWS Project").  *Id.*  SPAWAR enlisted the services of Defendant Serco to work on the

project.  SPAWAR and Defendant did not need to enter into an AWS-specific contract because they had two ongoing contracts (known as "Indefinite Duration, Indefinite Quantity" contracts), the "NESS Contract" and "SPECTECH Contract." *Id.* ¶¶ 7, 9, 11. Pursuant to the NESS and SPECTECH contracts, SPAWAR would submit individual "Delivery Orders" to Defendant, detailing the work that Defendant was to complete for pay.  *Id.* ¶¶ 12, 17, 19-24.  SPAWAR submitted a total of seven Delivery Orders to Defendant for work on the AWS Project.  Defendant performed work under six of these Delivery Orders, and periodically submitted invoices, known as public vouchers, to the Defense Finance and Accounting Service ("DFAS") in order to receive payment for work done under the Delivery Orders.  *Id.* ¶¶ 31-32.  It is undisputed that these vouchers "constitute Serco's demands for payment on the U.S. government for its work on the AWS project."  *Id.* ¶ 33.

The first Delivery Order related to the AWS Project was Delivery Order No. 49, which covered a period of performance from September 2, 2009 to September 1, 2010. *Id.* ¶ 17.  Under Delivery Order 49, Defendant submitted a total of 19 vouchers for a total of $876,758.45.  *Id.* ¶ 36.  The second Delivery Order related to the AWS Project was Delivery Order No. 54, which covered a period of performance from January 25, 2010 to January 24, 2011.  *Id.* ¶ 22.  Under Delivery Order 54, Defendant submitted a total of 28 vouchers for a total of $4,623,908.61.  *Id*. ¶ 37.  Both of these Delivery Orders were given pursuant to the Ness Contract.  *Id.* ¶¶ 36-37.

**B. The Earned Value Management System ("EVMS") and Hours and Task Recording**

The EVMS is an accounting and management tool required to be implemented in the performance of certain federal government contracts.  The guidelines for utilizing this system are laid out in the American National Standards Institute/Electronic Industries Alliance Standard 748 ("ANSI 748").  *See* Pl.'s Ex. B, ECF No. 66-4.  The Federal Regulations call for government contractors performing certain government contracts to implement an EVMS compliant with ANSI 748.  For "cost or incentive

contracts valued at $20,000,000 or more," or whenever else an EVMS is required, Department of Defense agencies are instructed to "[u]se the provision(s) at [48 C.F.R. sections 252.234-7001, 52.234-2, and 52.234-3] in the solicitation" and "the clause at 252.234-7002 ... in the solicitation and contract."  48 C.F.R. § 234.203.  48 C.F.R. section 252.234-7002 ("DFARS") is long form clause, requiring an "Earned Value Management System (EVMS) that complies with [ANSI 748]" and detailing how the contractor is to get its EVMS validated by the appropriate agency.  48 C.F.R. § 252.234-7002.  Similarly, for other federal government contracts, "[t]he contracting officer shall insert a clause that is substantially the same as the clause at [48 C.F.R. section 52.234-4] in solicitations and contracts that require a contractor to use EVMS." 48 C.F.R. § 34.203(c).  48 C.F.R. section 52.234-4 ("FARS") is also a long form clause, requiring an "Earned Value Management System (EVMS) that has been determined by the Cognizant Federal Agency (CFA) to be compliant with [ANSI 748] to manage this contract."  48 C.F.R. § 52.234-4.

It is undisputed that neither FARS or DFARS were incorporated by reference into the NESS or SPECHTECH contracts.  *See* Serco's SSUF ¶ 13, ECF No. 70-1 at 7-8. However, ANSI 748 was listed under "APPLICABLE DOCUMENTS" in Delivery Order Nos. 49 and 54.  (Brown Decl., Exs. C and D, ECF No. 64-1 at 117-18, 164-65). Those sections of the delivery orders provided that "[i]n the event of a conflict between the text of this SOW and the applicable document cited herein, the text of this SOW should take precedence."  *Id.*  at 117, 164.  These Delivery Orders also required Defendant to provide, among other Deliverables, Earned Value Management ("EVM") Reports "as called out in the CDRL [Contract Data Requirements List] requirements." *Id.* at 119-20.  The CDRLs state that, with respect to EVM reports, "[c]ontract format acceptable.  Create reports using MS Office Applications."  *see, e.g.*, *id.* at 175.

The process used by SPAWAR and Defendant in preparing these EVM reports, termed Contract Performance Reports ("CPRs"), involved multiple components. Defendant's AWS team members would enter the time spent on each Delivery Order

daily into Serco's own accounting system.  (Serco's SSUF ¶ 35, ECF No. 70-1 at 18).

Tom Helman, who headed the AWS Project at Serco, would then use the accounting

system and individual employees' records to compile a monthly Hours Report.  *Id.* ¶ 50.

Helman testified that he would submit these monthly Hours Reports to Mike

Melechinsky, a Project Manager for the AWS project at SPAWAR, but for the first year

of the project, Helman would provide monthly hours totals only, not broken down by

the various task codes.  (Helman Dep. at 66:17-67:9, ECF No. 66-8 at 5-6).  Hours

Reports from SPAWAR, NAVFAC (another Navy agency working on the AWS

Project), and Defendant would then be combined into an Actual Cost Report, provided

to DHS.  (Serco's SSUF ¶ 53, ECF No. 70-1 at 27).  John Mitchell and Suzette Mankel,

SPAWAR Project Managers, and Raymond Day, the EVM lead for Serco, would then

insert data from the Actual Cost Report into an "Integrated Master Schedule" ("IMS"),

"which function was to break down a large project into a task by task basis, ordered

according to sequence, then estimate the projected time and cost to complete each task,

then track the actual performance against the estimates."  *Id.* ¶¶ 54, 56; Mitchell Dep.

at 54:12-56:1, ECF No. 65-9 at 52-54).  The IMS included a series of thousands of

tasks, known as a "Work Breakdown Structure" ("WBS").  *Id.* ¶ 55.  Finally, data from

the IMS would be used to create final EVM reports, CPRs and "CSSRs."  *Id.* ¶ 58.

### C. Serco's EVM Performance

Serco employees kept track of their time manually, instead of "an *automated*

time keeping system that is tied to control accounts so that contemporaneous tracking

of time can be achieved."  (Relator's Statement of Additional Undisputed Facts

("SAUF") ¶ 138, ECF No. 66-1 at 43).  Relator testified that Serco employees only

charged their time to a single charge code. (Kelly Dep. at 115:24-116:13, ECF No. 66-

10 at 8-9).  Relator's Expert Kevin Martin opines that the Actual Cost Reports and final

CPR reports submitted to DHS were inherently inaccurate as a result of this practice.

(Expert Report of Kevin Martin at 8, ECF No. 66-3  at 10).

After the first year of the project, Helman started asking employees for a

breakdown of their total time by task category in order to provide more detailed Hours Reports to SPAWAR.  (Helman Dep. at 68:10-72:12, ECF No. 65-9 at 309-13).  To do this, Helman would ask employees for a breakdown of their time at the end of the month.  *Id.* at 72:2-12.  Helman testified that these time allocations were estimates, and that he did not disclose this fact to SPAWAR or DHS because they would not have cared.  *Id.* at 72:17-73:13.  Relator testified that he could only recall two occasions where Helman requested an estimate of a breakdown of his hours on the AWS project for the prior month.  (Kelly Dep. at 122:12-123:3, ECF No. 66-10 at 10-11).

In addition to time tracking, Relator also relies on his expert in identifying sixteen different ANSI 748 guidelines that Defendant failed to comply with in performing the Delivery Orders.  (Relator's SAUF ¶ 136, ECF No. 66-1 at 41-42).

Relator testified that on two occasions, he witnessed inaccurate EVM reporting, or the encouragement of inaccurate EVM reporting.  On one occasion, he observed Raymond Day, the EVM lead for Serco, and Mike Phillips, the Project Manager at SPAWAR, improperly moving budget figures around in preparing a CPR report. Relator testified: "Raymond [Day], it seemed, was attempting to kind of coach Mike [Phillips], as to how to apply the numbers against the budget" in a way so as to avoid giving "a bad EVM number down the road." (Kelly Dep. at 173:11-14, ECF No. 66-10 at 14).  Relator further testified that, if an actual cost did not fit well within the budget, Day and Phillips would move that dollar figure to a budgeted item that would look better on the report.  *Id.* at 173:24-175:1.  On another occasion, Relator testified that he overheard his fellow employee, Colleen, tell Relator's supervisor, Tom Helman, that she didn't feel comfortable billing full-time to the AWS Project.  Helman responded: "[H]a, that's nothing, there's a guy over at SPAWAR named Steve Gable who is charged to this project and has never worked a single hour on it." *Id.* at 190:7-191:6.

### D.  Changes in Defendant's Performance

Early in the performance of Delivery Order 49, Defendant attempted to set up automated time tracking but informed SPAWAR that it was unable to do so.  In January

2010, Defendant advised SPAWAR that its internal accounting system could not accommodate "all the 2000 project task line items" of the Work Breakdown Structure. (Serco's SSUF ¶ 43, ECF No. 70-1 at 21).  John Mitchell, a Project Manager at SPAWAR for the AWS Project, testified that he advised Denise Ellison of Serco that Serco did not need to install an automated time-tracking system and that it was acceptable to track time manually.  (Mitchell Dep. at 87:3-89:1, ECF No. 65-9 at 76-78).  Mitchell also testified that he would have sought DHS's approval before tracking time in this manner.  *Id.* at 221:1-21.  SPAWAR did not find the CPR reports helpful, and "constantly requested that DHS drop the EVM requirements." (Serco's SSUF ¶ 62, ECF No. 70-1 at 32).  The project managers at SPAWAR did not use the CPR (EVM) reports to manage the project, and instead limited use of these reports for DHS reporting.  *Id.* ¶ 63.  From January 2010 onward, Defendant's employees would track and provide its monthly costs on Excel spreadsheets, although it is disputed as to how accurately this was done.  *Id.* ¶ 47.  Between January 2010 and April 2011, DHS revised the EVMS reporting requirements on the AWS project at least four times. *Id.* ¶¶ 65-67, 69.

### E.  Relator Kelly's Employment with Serco

Relator was hired by Defendant in October of 2009 as an EVM Analyst III, whose duties included "identifying and investigating deviations from the EVMS with respect to project management for the AWS project."  (FAC ¶ 5, ECF No. 11 at 3). Relator testified that in the month prior to his termination, he reported Defendant's allegedly fraudulent cost tracking to Terri Van, a DHS officer in Washington D.C., and that, following his reporting, DHS "really started to dig into the contract performance reports and the schedule and became a lot more scrutinizing of what they were looking at."  (Kelly Dep. 215:17-217:24, 218:15-219:7, ECF No. 66-10 at 23-27).  Relator was laid off on May 4, 2011, and Serco personnel told him he was being laid off because SPAWAR and DHS decided to downsize the EVM requirement for the AWS project. (Magana Decl., Ex. D., ECF No. 65-7 at 18; Serco's SSUF ¶ 97, ECF No 70-1 at 49).

Following Kelly's termination, there was no longer an EVM Analyst position within Serco. *Id.* ¶ 98.

### III. Motion for Summary Judgment (ECF No. 65)

Defendant moves for summary judgment on all eight of Relator's claims for relief.

### A. Summary Judgment Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). Where the party moving for summary judgment does not bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542-43 (9th Cir. 1989) ("[O]n an issue where the plaintiff has the burden of proof, the defendant may move for summary judgment by pointing to the absence of facts to support the plaintiff's claim. The defendant is not required to produce evidence showing the absence of a genuine issue of material fact with respect to an issue where the plaintiff has the burden of proof. Nor does Rule 56(c) require that the moving party support its motion with affidavits or other similar materials negating

the nonmoving party's claim.") (quotation omitted).

If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotations omitted). The nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See Anderson*, 477 U.S. at 256.

**B. Submitting False Claims in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (First Claim)**

**i. Contentions of the Parties**

Defendant contends that the only "claims" submitted to the government for payment were the public vouchers submitted for payment under the delivery orders, and that Relator has not identified anything false about the public vouchers. (ECF No. 65-1 at 11). Defendant asserts that Relator does not identify problems with the total dollars billed to the government. Defendant further asserts that it made no implied or express certification, as a condition of payment, that it was complying with ANSI 748. Defendant contends that Plaintiff's "allegations" at best establish nothing more than a regulatory violation, which does not give rise to FCA liability. *Id.* at 22.

Defendant contends that any alleged failure to comply with ANSI 748 is not material because there is no evidence that, "had the payments been broken down in the method [Relator] asserts was required, the government would have paid any more or less to Serco." *Id.* at 24. Finally, Defendant contends that it cannot be liable where the government had approved of its method of submitting its monthly cost reports on Excel spreadsheets.

Relator contends that Defendant implicitly certified compliance with ANSI 748 because compliance with ANSI 748 was a condition of payment on the AWS Project. First, Relator contends that Defendant's submitted vouchers implicitly certified compliance with ANSI 748 because the government would not have paid Defendant had it known about non-compliance with ANSI 748. (ECF No. 66 at 21). Second, Relator contends that compliance with ANSI 748 was required by law, pursuant to OMB Circular A-11, HSAM 3034.200(a)(3), and 48 C.F.R. 234.203. *Id.* at 11-12. As to 48 C.F.R. § 234.203, Relator contends that compliance was required because the NESS Contract was valued in excess of $20 Million. *Id.* Third, Relator contends that the Delivery Orders at issue expressly required compliance with ANSI 748 as a condition of payment. Relator contends that this express condition is supported by the fact that a substantial portion of the deliverables required by the Delivery Orders were related to EVM reporting, and EVM reports must comply with ANSI 748. *Id.* at 22. Relator further contends that these Delivery Orders were also "completion delivery orders," meaning that unless the deliverables are actually delivered, payment is improper. *Id.* at 9. Finally, Relator contends ANSI 748 condition was not waived because John Mitchell, the SPAWAR project manager, did not have authority to waive contractual requirements. *Id.* at 14.

Relator asserts that Defendant did not comply with the ANSI 748 condition in many regards, including: failing to set up "control accounts," failing to assign control managers, failing to integrate timekeeping and accounting with control accounts, and failing to record hours worked according to each control account. *Id.* at 15.

Finally, Relator asserts that Defendant knew of the EVMS requirement and declined to follow it. Relator asserts that hours were tracked in an inaccurate manner because Tom Helman, Relator's supervisor, only periodically requested employees to provide a breakdown of their hours. In addition, Relator offers the results of "validity tests" conducted by his expert, Kevin Martin, on monthly CPRs which demonstrate that actual costs were so closely aligned to budgeted costs in the reports that the numbers

must have been fraudulently changed in order to feign compliance with ANSI 748.  *Id.* at 17-18.

### ii.  Law

The False Claims Act provides for liability for one who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  To establish a cause of action under section 3729(a)(1)(A), the relator must prove the following elements: (1) a false or fraudulent claim (2) that was material to the decision-making process (3) which defendant presented, or caused to be presented, to the United States for payment or approval (4) with knowledge that the claim was false or fraudulent.  *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012).  "Claim" is defined as "any request or demand, whether under a contract or otherwise, for money or property ... presented to an officer, employee, or agent of the United States...."  31 U.S.C. § 3729(b)(2).

Under a false certification theory, FCA liability can attach where a party "falsely certifies compliance with a statute or regulation as a condition to payment."  *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006).  There are two types of false certifications, express and implied.  "Express certification simply means that the entity seeking payment certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted."  *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).  "Implied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim."  *Id.* Under a theory of implied false certification, it is only possible for a claimant to implicitly certify compliance with a law, rule, or regulation if there is a relevant "statute, rule, regulation, or contract" in place that conditions payment of the claim on compliance with that underlying law, rule or regulation.  *See id.* at 999-1001.  "Violations of laws, rules, or regulations alone do not create a cause of action under the

FCA.   It is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) (emphasis in original).

### iii.  Analysis

"[T]he [FCA] attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *U.S. ex rel. Cafasso v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting *U.S. v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)). It is undisputed that Defendant's claims submitted to the government were sent in the form of public vouchers.  There is no evidence demonstrating, and Relator has not alleged or contended, that the vouchers contained any false or inaccurate information.[1]  Relator's FCA claim is that the vouchers implicitly falsely certified compliance with ANSI 748.  *See Ebeid*, 616 F.3d at 998.  The Court must determine whether there was a "statute, rule, regulation, or contract that condition[ed] payment on compliance with [ANSI 748]." *Id.* at 1000.

### a.  Regulations

Relator relies on three regulations: HSAM 3034.200(a)(3); OMB Circular A-11, Part 7; and 48 C.F.R. section 234.203.  HSAM 3034.200(a)(3) is part of the Department of Homeland Security Acquisition Manual, which states in its Foreword that it is "non-regulatory in nature and provides uniform procedures for the internal operation of acquiring supplies and services within the Department of Homeland Security." Department of Homeland Security Acquisition Manual, U.S. Department of Homeland Security (October 2009).  HSAM 3034.200(a)(3) states that OMB Circular A-11 requires the use of an EVMS "that meets the American National Standards Institute (ANSI)/Electronics Industries Alliance (EIA) Standard - 748 for both Government and contractors."  HSAM 3034.200(a)(3).

---

[1] Although Relator contends that Defendant's EVM reporting and time tracking methods were improper, Relator does not present evidence or contend that any of the alleged misconduct led to explicitly false statements on the public vouchers.

The latest version of OMB Circular A-11, Part 7 that discusses ANSI 748 is the July 2010 version. *See* Office of Mgmt. & Budget, Exec. Office of the President, OMB Circular A-11, pt. 7, Planning, Budgeting, Acquisition, and Management of Capital Assets (July 2010) ("OMB Circular A-11, Part 7"), *available at*: http://www.whitehouse.gov/sites/default/files/omb/assets/a11_current_year/a_11_20 10.pdf. Section 300.2, titled "Does this section apply to me?," provides that "[t]he policy and budget justification and reporting requirements in this section apply to all agencies of the Executive Branch of the Government subject to Executive Branch review (see section 25)." OMB Circular A-11, pt. 7, section 300.2. Section 25.1 of Part 2 of the Circular, in turn, provides that "the instructions in Part 2 generally apply to all Government agencies," the District of Columbia, and Government-sponsored enterprises. OMB Circular A-11, pt. 2, § 25.1.

Neither HSAM 3034.200(a)(3) nor OMB Circular A-11, Part 7 regulate government contractors. These publications do not impose requirements on government contractors directly. The Court concludes that these regulations cannot provide the basis for Relator's implied certification claim.

48 C.F.R. section 234.203 provides that Department of Defense agencies are instructed to "[u]se the provision(s) at [48 C.F.R. §§ 252.234-7001, 52.234-2, and 52.234-3] in the solicitation" and "[DFARS].... in the solicitation and contract" for "cost or incentive contracts valued at $20,000,000 or more," or whenever else an EVMS is required. 48 C.F.R. § 234.203. 48 C.F.R. section 234.203 *does* require the insertion of the DFARS clause into contracts valued at $20 Million or more, and the DFARS clause does, in turn, require compliance with ANSI 748. However, this regulation does not, without incorporation into a contract, expressly condition payment on compliance with ANSI 748, or impose any duties on a government contractor. It is undisputed that DFARS was not incorporated by reference into the NESS Contract or Delivery Orders. (Serco's SSUF ¶ 14, ECF No. 70-1 at 8; Relator's Evidence in Support of Response to Serco's SSUF ¶ 13, ECF No. 66-1 at 5 ("Delivery orders issued pursuant to the

1   NESS contract cannot incorporate FARS or DFARS that were not included in the
2   underlying NESS Contract.")).

3       The Court concludes that there is no regulation that expressly conditions payment
4   for the vouchers in this case on Defendant's compliance with ANSI 748.

5                            **b. Contracts**

6       It is undisputed that the NESS Contract and the Delivery Orders did not
7   incorporate FARS or DFARS by reference, the two regulations that, if incorporated,
8   might be read as expressly conditioning payment on compliance with ANSI 748.
9   (Serco's SSUF ¶ 14, ECF No. 70-1 at 8; Relator's Evidence in Support of Response to
10  Serco's SSUF ¶ 13, ECF No. 66-1 at 5 ("Delivery orders issued pursuant to the NESS
11  contract cannot incorporate FARS or DFARS that were not included in the underlying
12  NESS Contract.")).   There is no other language in the Delivery Orders expressly
13  conditioning payment on compliance with ANSI 748.  The reference to ANSI 748 under
14  a section titled "APPLICABLE DOCUMENTS" does not expressly condition payment
15  on compliance with ANSI 748.

16      Relator contends that compliance with ANSI 748 was an implied condition in the
17  Delivery Orders because: (1) ANSI 748 was referenced under a section entitled
18  "APPLICABLE DOCUMENTS" in the Delivery Orders, (2) Defendant was hired for
19  the very purpose of doing EVM reporting, (3) ANSI 748 is the only way to do EVM
20  reporting, and (4) the Delivery Orders were "completion delivery orders," meaning
21  "you have products and deliverables that are expected to be completed in order to be
22  paid." (Martin Dep. at 120:6-8, ECF No. 66-6 at 19).  However, an *implied* condition
23  in a contract cannot form the basis for an implied false certification claim, which
24  requires that the defendant undertake to "*expressly* comply with a law, rule, or
25  regulation."  *Ebeid*, 616 F.3d at 998 (emphasis added). Even accepting Relator's
26  contractual interpretation, Defendant may have breached the contract, but it has not
27  violated the FCA. *U.S. ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 326 (9th
28  Cir. 1995) ("[Relator's] argument [that the defendant's 'fail[ure] to adhere strictly to the

contractual and military specifications constituted a violation of the FCA'] raises questions of contract interpretation rather than false claims."); *Cafasso*, 637 F.3d at 1047 (holding that a contractor's failure to comply with a contract's disclosure requirements and then receiving payment on the contract is not a false claim but a breach of contract); *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010) (noting that the requirement for false certification claims—that the contractor's compliance with federal statutes, regulations, or contract provisions be a "condition" or "prerequisite" for payment—exists because "[t]he FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts.").

The Court finds that neither the NESS Contract nor the Delivery Orders require compliance with ANSI 748 as a condition of payment by the government.

### c. Conclusion

The Court concludes Defendant has met its initial burden of demonstrating the lack of evidence of a false claim in the record. The Court further concludes that Relator has not carried his burden to come forward with evidence demonstrating that the public vouchers Defendant submitted for payment contained anything false or inaccurate, or demonstrating an implicitly false certification of compliance with ANSI 748 in those vouchers. Without evidence of a false claim, Relator's First Claim must fail. *See U.S. ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 997 (9th Cir. 2002) ("It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim."). Relator's evidence of Serco employees moving hours around into different task codes to better fit the budget does not raise an issue of material fact because there is no evidence or contention that this practice resulted in a false claim submitted to the government.[2] *See Cafasso*, 637 F.3d at 1055 (noting that the focus of the FCA is on the "claim for payment," not the underlying fraud). Defendant's Motion for Summary

---

[2] Specifically, Relator's testimony (1) that he overheard Tom Helman discussing the inflated billing practices of a SPAWAR employee and (2) that he witnessed Raymond Day and Mike Phillips improperly moving budget figures around are not relevant.

1    Judgment on Relator's First Claim is granted.

2         **B.   Making False Records Material to a False or Fraudulent Claim in**

3         **Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (Second Claim)**

4         Defendant contends that there is no evidence of any false claim or that any

5    allegedly false statement was material to the government's decision to pay Defendant.

6    Relator asserts that on a monthly basis, "every IMS, CPR, CSSR and cost spreadsheet

7    submitted by Defendant contained unreliable and false cost information." (ECF No. 66

8    at 22).   Relator contends that these "records" were "material" because they were

9    deliverables under the Delivery Orders.  *Id.*

10        Section 3729(a)(1)(B) creates liability for one who "knowingly makes, uses, or

11   causes to be made or used, a false record or statement material to a false or fraudulent

12   claim."  31 U.S.C. § 3729(a)(1)(B).  Section 3729(a)(1)(B) requires that a false claim

13   be submitted.  *Cf. Cafasso*, 637 F.3d at 1055 (interpreting former FCA false records

14   provision as requiring "an actual demand for payment").   "To prove a claim under this

15   subsection, a plaintiff must show that: (1) the defendant made (or caused to be made)

16   a false statement, (2) the defendant knew it to be false, and (3) the statement was

17   material to a false claim. [Citation.].  Thus, this subsection contains a 'double falsity'

18   requirement-the plaintiff must plead both a false statement and a corresponding false

19   claim."  *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, No. 11 Civ. 8196,  —F. Supp.

20   2d—, 2014 WL 2324465, at *8 (S.D.N.Y. May 29, 2014) (citation omitted).

21        Without a false claim, a "false record or statement" cannot, by definition, be

22   "material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  The asserted

23   inaccuracies in Defendant's various EVM-related reports are not material because

24   Relator does not contend or present evidence that there is anything inaccurate in the

25   public vouchers themselves.  Relator has failed to present any evidence to support this

26   essential element of a false records claim.  The Court finds that Relator's false records

27   claim fails as a matter of law.

28        Defendant's Motion for Summary Judgment on Relator's Second Claim is

1   granted.

2   **C.   Conspiring to Violate the False Claims Act, 31 U.S.C. §**

3   **3729(a)(1)(C) (Third Claim)**

4   Relator asserts that Defendant "secretly conspired" with John Mitchell, the AWS

5   project manager from SPAWAR, when they agreed that Defendant no longer had to

6   comply with ANSI 748's requirements and could collect costs manually. (ECF No. 66

7   at 25). Relator asserts that this agreement was made without the knowledge of anyone

8   else at SPAWAR, and that Mitchell lacked the authority to modify the contract. *Id.*

9   Defendant contends that this was not a conspiracy, but an agreement concerning cost

10   tracking and reporting that was approved by DHS. (ECF No. 70 at 10).

11   Section 3729(a)(1)(C) creates liability for one who "conspires" to violate the

12   FCA, including conspiring to "present.... a false or fraudulent claim" or make or use a

13   "false record or statement material to a false or fraudulent claim." 31 U.S.C. §

14   3729(a)(1)(A)-(C). Although the Ninth Circuit does not appear to have interpreted this

15   recently enacted provision, courts have applied general principles of civil conspiracy

16   to former versions of this provision. *See U.S. ex rel. Durcholz v. FKW, Inc.*, 189 F.3d

17   542, 545 n.3 (7th Cir. 1999). As the Sixth Circuit explained in an FCA case:

18   A civil conspiracy is an agreement between two or more persons to injure
    another by unlawful action. Express agreement among all the conspirators

19   is not necessary to find the existence of a civil conspiracy. Each
    conspirator need not have known all of the details of the illegal plan or all

20   of the participants involved. All that must be shown is that there was a
    single plan, that the alleged coconspirator shared in the general

21   conspiratorial objective, and that an overt act was committed in
    furtherance of the conspiracy that caused injury to the complainant.

22

23   *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991) (quoting *Hooks v. Hooks*,

24   771 F.2d 935, 943-44 (6th Cir. 1985)). The Supreme Court has also interpreted the

25   former version of this provision to require intent to defraud the government. *Allison*

26   *Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672-3 (2008).

27   Defendant has met its initial summary judgment burden by demonstrating an

28   absence of evidence in the record of a conspiracy to submit a false claim. Defendant

has also presented testimony negating a conspiracy between John Mitchell and Defendant. Mitchell's uncontroverted testimony is that he informed DHS of Defendant's modified hours tracking and DHS approved the change. (Mitchell Dep. at 87:21-88:15, ECF No. 65-9 at 76-77).

Relator has failed to meet his burden to come forward with any evidence to show a conspiracy to present a fraudulent claim to the government. First, there is no evidence of an agreement between John Mitchell and Serco personnel to submit a false claim. Relator asserts that the agreement was "secret" and "Defendant has no evidence that DHS approved a violation of ANSI-748 guidelines and failed to provide any evidence that the delivery orders were changed to allow such a waiver of applicable regulations." (ECF No. 66 at 25; Relator's Evidence in Support of Response to Serco's SSUF ¶ 45, ECF No. 66-1 at 15-16). Relator's unsubstantiated assertion of a secret agreement is not *evidence* of a conspiracy to submit a false claim. Construing the facts in a light most favorable to Relator, the agreement between Defendant and Mitchell to track time manually is an effort to modify a contract without authority to do so, not a conspiracy to submit a false claim in the form of public vouchers.

Second, even if there was a conspiracy to modify the Delivery Orders without DHS consent, that conspiracy cannot result in liability under 31 U.S.C. section 3729(a)(1)(C) absent any evidence of a resulting false claim or intent to submit a false claim. *See* 31 U.S.C. § 3729(a)(1)(C) (the conspiracy must be, among other violations of the FCA, to present a false claim or to make a false record material to a false claim). As discussed above, there is no evidence of a false claim in this case. Nor is there evidence that Defendant and Mitchell's agreement to track time manually was intended to result in a false claim. Finally, to the extent Relator's theory is a conspiracy to implicitly falsely certify compliance with ANSI 748, it fails as a matter of law on the ground that there is no statute, regulation, or contractual provision expressly conditioning Defendant's right to be paid on the vouchers with compliance with ANSI

1  748.

2      The Court concludes that there is no triable issue of material fact as to the

3  existence of a conspiracy to violate the FCA.  Defendant's Motion for Summary

4  Judgment on Relator's Third Claim is granted.

5      **D.  Retention of Overpayments in Violation of the False Claims Act, 31**

6      **U.S.C. § 3729(a)(1)(G) (Fourth Claim)**

7      Section 3729(a)(1)(G) creates liability for one who "knowingly makes, uses, or

8  causes to be made or used, a false record or statement material to an obligation to pay

9  or transmit money or property to the Government, or knowingly conceals or knowingly

10 and improperly avoids or decreases an obligation to pay or transmit money or property

11 to the government."  31 U.S.C. § 3729(a)(1)(G).  This "reverse false claims" provision

12 "attempts to provide that fraudulently reducing the amount owed to the government

13 constitutes a false claim."  *Cafasso*, 637 F.3d at 1056.

14     Defendant contends that Relator's retention claim must fail because Defendant

15 never had a duty to pay the government at the time of any alleged false claim.  Relator

16 contends that "all monies paid to Defendant were paid in error and in reliance upon

17 Defendant's fraud" because ANSI 748 was not complied with.  (ECF No. 66 at 26).

18 Relator contends Defendant has a resulting duty to repay the government all money

19 received from the vouchers.  *Id.*

20     The Court finds that Relator's Fourth Claim fails as a matter of law.  The Court

21 having previously determined that there is no evidence of a false claim, Defendant

22 cannot be liable under the FCA for retaining the money it received from the public

23 vouchers.  Nor can Defendant be liable for a "reverse false claim" without a false

24 statement to avoid paying the government back for work on the AWS Project. *Cafasso*,

25 637 F.3d at 1056 ("The 'reverse false claims' provision does not eliminate or supplant

26 the FCA's false claim requirement; it rather expands the meaning of a false claim to

27 include statements to avoid paying a debt or returning property to the United States.").

28     Defendant's Motion for Summary Judgment on Relator's Fourth Claim is

1   granted.

2   **E.  Retaliation in Violation of California Government Code § 12653(b)**

3   **(Fifth Claim)**

4   Defendant contends that section 12653(b) did not extend protection to federal

5   whistle-blowers and that Relator lacks evidence that he engaged in protected activity

6   or that Defendant knew about his activity.  Relator did not address Defendant's section

7   12653(b) arguments in his opposition or at oral argument.  Defendant contends that

8   Relator has abandoned this claim.  (ECF No. 70 at 10).

9   California Government Code section 12653(b) is part of California's False

10  Claims Act, California Government Code sections 12650-12655.  Former section

11  12653(b) prohibited employers from discharging or otherwise discriminating against

12  employees "[1] in disclosing information to a government or law enforcement agency

13  or [2] in furthering a false claims action, including investigation for, initiation of,

14  testimony for, or assistance in, an action filed or to be filed under Section 12652."  Cal.

15  Gov. Code § 12653(b).[3]  Under former section 12653(b), a plaintiff must establish "(1)

16  she was engaged in protected conduct; (2) [the defendant] knew she engaged in such

17  conduct; and (3) [the defendant] retaliated against her because of the conduct."

18  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  The

19  only court to address this issue has held that former section 12653(b) does not protect

20

21  _____

22  [3]  Effective January 1, 2013, after Relator filed the FAC, this provision was moved to section 12653(a) and revised to explicitly exclude protection for federal whistle-blowers:

23

24  Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of his or her employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop one or more violations of this article.

25

26

27

28  Cal. Gov. Code § 12653(a).

federal whistle-blowers because it was part of California's False Claims Act, which prohibits false claims made only to California state and local governments. *See Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1056 (C.D. Cal. 2000).

The Court concludes that Relator has abandoned this claim. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009) (holding that a plaintiff abandons his claims by failing to address them in opposition to a motion for summary judgment and waives his challenge to the district court's order). Defendant's Motion for Summary Judgment on Relator's Fifth Claim is granted.[4]

## F. Unlawful Retaliatory Discharge, California Labor Code § 1102.5 (Sixth Claim)

The FAC alleges violations of California Labor Code section 1102.5, subdivisions (b), (c), and (d).

### i. Section 1102.5(b)

Defendant contends that there is no evidence that Relator actually reported Defendant's practices to DHS. Defendant also contends that Relator's reporting was not a protected activity because Defendant's practices were not illegal. Finally, Defendant asserts that no one at Serco was aware that Relator reported Defendant's practices to DHS. Relator contends that he did testify that he reported Defendant's practices to DHS and that "[t]he timing of Relator's termination is evidence of the retaliatory conduct alleged." (ECF No. 66 at 28).

California Labor Code section 1102.5(b) provides:

---

[4] Even in the absence of Relator's abandonment, the Court finds that summary judgment is proper on Relator's Fifth Claim. There is no issue of material fact as to whether Defendant knew that Relator reported to Terri Van at DHS. Tom Helman, Relator's supervisor, and Denise Ellison, Helman's supervisor, both testified that they were not aware of Relator's reporting activities. (Helman Dep. at 150:4-15, ECF No. 65-9 at 328; Ellison Decl. ¶ 17, ECF No. 65-5 at 4). Relator has not presented any evidence controverting this testimony, or any evidence that would permit the inference that any other Serco employee was aware of his reporting activity.

1
2
3
4
5
6
7

> (b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

8  Cal. Lab. Code § 1102.5(b).  "The elements of a section 1102.5(b) retaliation cause of

9  action require that (1) the plaintiff establish a prima facie case of retaliation, (2) the

10 defendant provide a legitimate, nonretaliatory explanation for its acts, and (3) the

11 plaintiff show this explanation is merely a pretext for the retaliation."  *Patten v. Grant*

12 *Joint Union High Sch. Dist.*, 134 Cal. App. 4th 1378, 1384 (2005).  "To [establish a

13 prima facie case], a plaintiff must show (1) she engaged in a protected activity, (2) her

14 employer subjected her to an adverse employment action, and (3) there is a causal link

15 between the two."  *Id.*  "The causal link may be established by an inference derived

16 from circumstantial evidence, such as the employer's knowledge that the [employee]

17 engaged in protected activities and the proximity in time between the protected action

18 and allegedly retaliatory employment decision."  *Morgan v. Regents of Univ. of Cal.*,

19 88 Cal. App. 4th 52, 69 (2000) (citing *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir.

20 1988) and *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 614-15 (1989))

21 (internal quotations omitted).

22       Defendant has met its initial summary judgment burden in demonstrating an

23 absence of evidence that anyone at Serco was aware of Relator's reporting to Terri Van

24 at DHS.  Tom Helman, Relator's supervisor, and Denise Ellison, Helman's supervisor,

25 both testified that they were not aware of Relator's reporting activities.  (Helman Dep.

26 at 150:4-15, ECF No. 65-9 at 328; Decl. of Denise Ellison ¶ 17, ECF No. 65-5 at 4).

27 Relator has not presented any evidence controverting this testimony or any evidence

28 that would permit the inference that any other Serco employee knew of Relator's

reporting to Terri Van.  Without any evidence of Defendant's knowledge, a causal link based on proximity in time cannot be inferred.  *Morgan*, 88 Cal. App. 4th at 69 (noting that the causal link may be established by both "the employer's knowledge that the [employee] engaged in protected activities *and* the proximity in time between the protected action and alleged retaliatory employment decision.") (emphasis added).  The Court finds that Relator has failed to establish a prima facie case as to a "causal link" between Relator's protected activity and his termination.  *Patten*, 134 Cal. App. 4th at 1384.

The Court further finds that, even if Relator had established a prima facie case, Defendant has rebutted it with "substantial evidence" of a legitimate, nondiscriminatory reason for Relator's termination.  *Morgan*, 88 Cal. App. 4th at 68.  Tom Helman, Relator's supervisor, and John Mitchell, the AWS Project Manager from SPAWAR, both testified that Mitchell informed Defendant via email in April or May 2011 that SPAWAR and DHS no longer needed two employees to work on EVM for the AWS Project.  (Helman Dep. at 103:12-105:21, 149:12-20, ECF No. 65-9 at 319-21, 327; Mitchell Dep. at 124:18-125:22, ECF No. 65-9 at 105-106).  Relator admitted that he was given this reason at the time he was fired, and it is undisputed that Relator's position no longer existed after he was laid off.  (Kelly Dep. at 226:14-227:2, ECF No. 65-9 at 425-26; Serco's SSUF ¶ 98, ECF No. 70-1 at 49).

Finally, without evidence of Defendant's knowledge, Relator's conversation with Terri Van is not "specific" and "substantial" circumstantial evidence that would create a triable issue with respect to whether Defendant's proffered reason was pre-textual.  *See Morgan*, 88 Cal. App. 4th at 69 ("Circumstantial evidence of pretense must be specific and substantial in order to create a triable issue with respect to whether the employer intended to discriminate on an improper basis") (internal quotations and citations omitted).

The Court concludes that Defendant is entitled to summary judgment on Relators California Labor Code section 1102.5(b) claim.

### ii.  Section 1102.5(c)

Defendant contends that it is entitled to summary judgment on Relator's section 1102.5(c) claim because Relator did not refuse to engage in any conduct.  Defendant further contends that its conduct was not illegal.  Finally, Defendant contends that Relator was not terminated for his refusal to engage in any conduct. (ECF No. 65-1 at 31-32).  Relator asserts that he did, in fact, object to Defendant's practices, and "[t]he timing of Relator's termination is evidence of the retaliatory conduct alleged." (ECF No. 66 at 28).

California Labor Code section 1102.5(c) prohibits an employer from retaliating against an employee for "refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Cal. Lab. Code § 1102.5(c).  To establish a prima facie case under section 1102.5, a plaintiff must offer proof that (1) he engaged in a protected activity, (2) the defendant subjected them to adverse employment actions, and (3) there is a causal link between the two. *Casissa v. First Republic Bank*, Nos. C 09-4129 and C 09-4130, 2012 WL 3020193, at *9 (N.D. Cal. July 24, 2012).

The Court finds that there is no triable issue of fact as to whether Relator "refused to participate" in any allegedly illegal activity.  Relator's only evidence confirms just the opposite, that Relator did not object.  Relator admitted that any refusal to participate in the allegedly fraudulent practices of SERCO "wasn't an outward refusal." (Kelly Dep. at 229:9-17, ECF No. 66-10 at 28).  Significantly, there is evidence that Relator participated in the practice that he complains of: waiting until the end of a month to allocate his monthly time to specific tasks.  In a response to a request from his supervisor, Tom Helman, for his time allocations for the month of October, Relator stated:

> For Oct., I would put the first half of the month (50%) into EVM Monitor - 1.1.5.24.  For the 2nd half of the month (50%), it could technically be charged to IMS Rework, w/in the PDR file, which is 1.6.2.7.1.3.  However if that is all supposed to be behind the scenes, you could just throw 50% into 1.6.2.7.1.1, which is PDR Planning.  Thanks.

(ECF No. 66-15 at 2).

The Court concludes that Relator has not raised a triable issue of material fact as to his California Labor Code section 1102.5(c) claim.

### iii.  Section 1102.5(d)

Subdivision (d) prohibits an employer from retaliating against an employee for "having exercised his or her rights under subdivision (a), (b), or (c)" in "any former employment."  Cal. Lab. Code § 1102.5(d).

Because there is no evidence that Defendant retaliated against Relator for exercising his rights under subdivisions (b) or (c), Defendant is also entitled to summary judgment as to a section 1102.5(d) claim.

### iv.  Conclusion

Defendant's Motion for Summary Judgment on Relator's Sixth Claim is granted.

### G.  Termination in Violation of Public Policy (Seventh Claim)

Defendant contends that Relator's termination in violation of public policy claim fails because all of Relator's claims alleging violations of laws fail.  Relator contends that summary judgment is not proper on this ground because Defendant is not entitled to summary judgment on his other claims.

A termination in violation of public policy claim requires a "violation of a fundamental public policy expressed in a statute or a constitutional provision." *Jennings v. Marralle*, 8 Cal. 4th 121, 130 (1994).  The Court finds that there is no evidence of a "violation of a fundamental public policy" to support a termination in violation of public policy claim.  Defendant is entitled to summary judgment on all claims alleging violations of law, and Relator has identified no other fundamental public policy to support this claim.  *See Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1354 (9th Cir. 1996) (holding that, where the defendant is entitled to summary judgment on ADA claims, the termination in violation of public policy claim must fall with it).

Defendant's Motion for Summary Judgment on Relator's Seventh Claim is granted.

**H.  Breach of Contract of Continued Employment (Eighth Claim)**

Defendant asserts that its Human Resources Policy makes clear that Relator's employment was at-will.  Defendant further asserts that Relator admitted he was never assured that he would not be arbitrarily terminated or that he read anything anywhere about good cause being required for termination.  *Id.*  Relator contends that the relevant Human Resources Policy stated that "employment with Serco is at will, meaning employment is voluntary and subject to termination by the employee or Serco at any time and for any reason *not prohibited by law.*"  (ECF No. 66 at 29) (emphasis added).  Relator contends that his termination was in fact prohibited by law, specifically 31 U.S.C. section 3730(h), an FCA provision that prohibits retaliation for FCA whistle-blowing, and California Labor Code section 1102.5.

The Court finds that there is no issue of material fact as to Relator's Eighth Claim.  Defendant is entitled to summary judgment on Relator's FCA claims and section 1102.5 claims.  Because Defendant did not violate the FCA or section 1102.5, Relator's termination was not "prohibited by law."[5]

Defendant's Motion for Summary Judgment on Relator's Eighth Claim is granted.

**IV.  Motions to File Documents Under Seal (ECF Nos. 63, 68)**

Defendant lodged twenty-one full exhibits under seal in support of its Motion for Summary Judgment (ECF No.  63) and four full exhibits under seal in support of its Reply Regarding Motion for Summary Judgment (ECF No. 68).  These exhibits consist of (1) every contract relevant to this case, including the SPECTECH Contract, the NESS Contract, and all of the relevant Delivery Orders pursuant to those contracts, (2) the public vouchers submitted by Defendant for payment from the U.S. Government, (3) the AWS Project Statement of Work from DHS to SPAWAR, (4) EVM-related

---

[5] Apart from allegedly terminating Relator in violation of law, Relator does not contend that there are any other ways in which Defendant breached its employment contract with Relator, whether express or implied.

deliverables completed pursuant to the Delivery orders, including the relevant IMSs, CPRs, Monthly Cost Reports, and Risk Management Plans, and (5) other AWS work product, including minutes from AWS Project meetings and AWS Project timelines. Defendant contends that each and every exhibit warrants sealing because they contain "information that may be exempt from public disclosure, such as commercially or competition sensitive information and internal confidential information produced by the government." (ECF Nos. 63 at 4, 68 at 2). Second, Defendant contends that "some of the documents have been designated as 'For Official Use Only' by the U.S. government, now identified as Controlled Unclassified Information ("CUI")." (ECF Nos. 63 at 4, 68 at 3). Third, Defendant contends that "several of the documents contained herein have been designated as 'CONFIDENTIAL' or 'CONFIDENTIAL – ATTORNEYS' EYES ONLY' under the Protective Order." (ECF Nos. 63 at 4, 68 at 3).

"Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'" *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc*., 435 U.S. 589, 597 & n.7 (1978)). Except for documents that are traditionally kept secret, there is "a strong presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003); *see also Kamakana*, 447 F.3d at 1178-79. "A party seeking to seal a judicial record then bears the burden of overcoming this strong presumption by meeting the compelling reasons standard. That is, the party must articulate compelling reasons supported by specific factual findings ... that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process." *Kamakana*, 447 F.3d at 1178-79 (citations and quotation marks omitted). The presumed right to access to court proceedings and documents can be overcome "only by an overriding right or interest 'based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Oregonian*

*Publ'g Co. v. U.S. Dist. Court*, 920 F.2d 1462, 1465 (9th Cir. 1990) (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1985)).

"Under the compelling reasons standard, a district court must weigh relevant factors, base its decision on a compelling reason, and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 679 (9th Cir. 2010) (quotations omitted). "'Relevant factors' include the 'public interest in understanding the judicial process and whether disclosure of the material could result in improper use of the material for scandalous or libelous purposes or infringement upon trade secrets.'" *Id.* at 659 n.6 (citing *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir.1995)); *see also Kamakana*, 447 F.3d at 1179 ("In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets.").

The Court finds that Defendant has not met its high burden of demonstrating "compelling reasons" for sealing twenty-five entire exhibits. Defendant gives only generalized reasons as to why all twenty-five exhibits should be sealed and does not give any particularized reason as to why any particular exhibit should be sealed. Even under the "good cause" standard of Rule 26(c), a particularized showing is required. *Kamakana*, 447 F.3d at 1180. Furthermore, reliance on a blanket protective order is not sufficient to meet the "compelling reasons" standard. *See Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992). However, the Court will not deny Defendant's Motions to File Documents Under Seal (ECF Nos. 63, 68) because it is impossible to ascertain, based on the present motion, whether any of the exhibits contain competitively sensitive information or confidential information of the U.S. Government. Defendant shall have an opportunity to offer specific and particularized "compelling reasons" as to why each exhibit warrants sealing.

**V.  Motion to Strike (ECF No. 71)**

Relator has offered deposition testimony of his expert, Kevin Martin, on several aspects of EVM reporting in compliance with ANSI 748, including whether compliance with ANSI 748 was required in this case, whether Defendant complied with ANSI 748, whether the ANSI 748 requirement was waived by the government, and whether Defendant was capable of doing EVM reporting in compliance with ANSI 748 with their own accounting system. (ECF No. 66-6).

Defendant moves to strike Martin's deposition testimony offered in Relator's Opposition as it relates to three opinions: (1) whether ANSI 748 was incorporated by reference into Defendant's contracts with SPAWAR, (2) whether John Mitchell, the AWS project manager from SPAWAR, had authority to waive the EVM requirement for Defendant, and (3) whether Defendant's accounting system could accommodate 2,000 task codes. (ECF No. 71 at 3). Defendant asserts that Martin is not qualified to testify as to EVM requirements and interpretations of government contracts because he has no legal or accounting training. *Id.* at 3. Defendant further asserts that testimony regarding incorporation by reference of ANSI 748 and John Mitchell's statements are outside the scope of Relator's initial expert disclosure, and, therefore, in violation of the Court's Case Management Order. *Id.* at 4. Defendant asserts that these opinions also exceed the scope of Martin's own expert report. *Id.* at 5. Finally, Defendant contends that Martin's interpretations are inadmissible as legal conclusions. (ECF No. 75 at 2-3).

In deciding Defendant's motion for summary judgment, the Court has reviewed Kevin Martin's deposition testimony. The Court did not consider Martin's testimony as it relates to legal requirements. The remainder of Martin's testimony is irrelevant because the Court determined that Defendant's entitlement to payment was not expressly conditioned on compliance with ANSI 748. Therefore, the Court did not consider Martin's testimony as to whether ANSI 748 was complied with or could be complied with.

Because the Court has granted Defendant summary judgment on all Relator's

claims and Martin's testimony played no part in the Court's analysis, Defendant's motion to strike is denied as moot.

**VI.   Conclusion**

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (ECF No. 65) is GRANTED.  Defendant's Motion to Strike the Testimony of Kevin Martin (ECF No. 71) is DENIED as moot.

IT IS FURTHER ORDERED that Defendant's Motions to File Documents Under Seal (ECF Nos. 63, 68) remain pending.  Within ten (10) days of this Order, Defendant may file a Supplemental Motion to File Documents Under Seal.  If a Supplemental Motion is not filed by that time, the Motions to File Documents Under Seal will be denied, and all exhibits will be ordered unsealed.

DATED:  October 6, 2014

**WILLIAM Q. HAYES**
United States District Judge